IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DIANA TRUE,<br><br>       Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC., a<br>Delaware corporation,<br><br>       Defendant. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 76)**<br><br>Case No. 2:21-cv-00433<br><br>Judge Dale A. Kimball<br><br>Chief Magistrate Judge Dustin B. Pead |

This action was assigned to United States District Court Judge Dale A. Kimball, who then referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B), to handle the case up to and including a Report and Recommendation on all dispositive matters.  (*See* ECF No. 29, Order of Reference; ECF No. 48, Order Re-Referencing Case.)  Now before the court is Defendant Delta Air Lines, Inc.'s motion for summary judgment—a dispositive motion.  (*See* ECF Nos. 76 (motion), 77 (appendix in support of motion) & 91 (reply brief).)  Plaintiff Diane True, who is now appearing *pro se*, opposes Delta's motion and has filed an opposition brief that included several exhibits.  (*See* ECF No. 88.)

Delta seeks summary judgment on Ms. True's two remaining causes of action:  race discrimination and retaliation in violation of Title VII.  As for the first, Delta argues that Ms. True has not and cannot establish a prima facie claim of

- 1 -

reverse-race discrimination and that Delta had a legitimate business-related reason for her termination that was not pretextual. Delta also argues that Ms. True's retaliation claim fails as a matter of law for two similar reasons. First, there is no causal connection between Ms. True's alleged protected conduct and her termination. And second, that Ms. True cannot establish that Delta's reason for her termination was pretextual. As set forth herein, the undersigned recommends that Delta's motion be granted.

<u>BACKGROUND</u>

The following facts are drawn from the record before the court as presented in the parties' briefs and the referenced exhibits.

Plaintiff, Diane True, who identifies as a white woman, was a long-standing Delta employee, having served as a Delta flight attendant for 31 years. In May 2018 Delta introduced a new "purple" uniform for its flight attendants. After Ms. True started wearing the new purple uniform she claims she broke down in hives, her eyes became irritated, and she suffered from other adverse reactions. (*See* ECF 88 at 5 ¶7; *see also* ECF No. 77, Ex. 3 (True Dep.) at 134:11–18.) In September 2018 Ms. True informed her supervisor that she was still suffering from adverse reactions to the purple uniform. Her supervisor then informed her that she could return to wearing Delta's older "black and white" uniform. (*See* ECF 88 at 5 ¶8.)

Despite the clothing change, Ms. True claims she continued to get ill because of her exposure to other flight attendants who were wearing the purple uniform. (*See* ECF 88 at 6 ¶9.) Ms. True claims that her reaction became so severe that in

October 2018 she stopped working and received worker's compensation.  (*See id.*)  In November 2018 she asked for and was granted leave by Delta and she remained out of work until the end of December 2018.  (*See id.*)

In early December 2018, while still out sick from Delta, Ms. True started a Facebook group dedicated to the issue of Delta's purple uniform to explore if other Delta employees were also having adverse reactions to the uniforms.  (*See* ECF No. 88 at 6 ¶10; ECF No. 77, Ex. 3 (True Dep.) at 120:9–16.)  According to Ms. True the size of this Facebook group grew to over 7,300 members.  (ECF No. 88 at 6 ¶10.)  Ms. True returned to work at Delta in November 2019, where she remained until March 2020 when she took a COVID-19-related leave of absence.  (ECF No. 88 at 8 ¶18-19.)

During this same period when Ms. True was employed by Delta, it appears she also had a public "personal" Facebook page in addition to the Facebook group she administered.  (ECF No. 77, Ex. 3 (True Dep.) at 315:13–18.)  In June 2020 it was brought to Delta's attention that other Delta employees were complaining about certain posts on Ms. True's Facebook page that they deemed offensive and racist and not in compliance with Delta's policies.  (*See* ECF 76 at 13 ¶36 (citing ECF No. 77, Exs. 9 and 10).)

Delta has several policies that address discrimination and harassment.  For example, Delta generally prohibits discrimination based on race, color, religion, national origin citizenship status, or other characteristics that may be protected by law.  (*See* ECF No. 76 at 8 ¶8 (citing ECF No. 77, Ex. 2, at 10).)  Nor does it tolerate

harassment or "bullying, intimidation (whether physical, written, or verbal)," or "threats of violence." (*See id*. ¶9 (quoting ECF No. 77, Ex. 2 at 6, 10).) And Delta's Social Media Policy, which applied to Ms. True and all Delta employees, informs all employees that their social media posts "'should never contain … racial or ethnic slurs" and that "bigoted, harassing, or offensive language and images are also not tolerated.'" (ECF No. 76 at 9 ¶16 (quoting ECF No. 77, Ex. 5 at 5 ("Social Media Policy)).) Delta's Social Media Policy also explains that "'social conversations by individuals who get identified as Delta employees that contain racial or other bigoted, hateful and offensive language or images can also offend Delta's customers and employees and harm our brand,'" and that when Delta becomes "aware of possible violations of [its] social media policy, [it] will conduct a thorough investigation and take appropriate responsive action." (ECF No. 76 at 10 ¶¶18–19 (quoting Social Media Policy at 3).)

Delta began an investigation into the complaints it received about Ms. True's postings. Among other things, it reviewed the posting and the complaints, interviewed Ms. True, and received post-interview written submissions from Ms. True concerning her social media postings. (*See* ECF No. 76 at 16–18 ¶¶45–50; ECF No. 77, Exs. 10–18.) Delta conducted its interview with Ms. True on June 12, 2020. At the interview Ms. True was asked to address her social media postings that were the subject of the complaints. (*See* ECF 76 at 16 ¶¶45–48; ECF No. 77, Ex. 15.).

- 4 -

Ms. True has conceded that the referenced postings, which were all published on or about January 2019, June 2019, and June 2020, contained comments that were harmful, offensive, and racists. (*See* ECF No. 77 Ex. 3 (True Dep.) at 346:17–20 (conceding that the posting about George Floyd attributed to her was racially inflammatory and was "horrible"); 348:9–12 (acknowledging that the post concerning George Floyd was "[e]xtremely" offensive and racist); ECF No. 2 (Compl.) at ¶21 (alleging that "someone hacked into her Facebook account and made racially inflammatory posts on the George Floyd incident"); *see also* ECF No. 88 at 10 ¶25 (acknowledging that the Facebook postings discussed at her interview "contain racist or insensitive remarks").)

Although Ms. True has admitted to writing some portion of these posts, she maintains that her Facebook account was hacked and that some of the language was changed or added by some unknown person or persons. (*See* ECF No. 77, Ex. 3 (True Dep.) at 317:11–13; 331:1–12; 345:21–23; 346:7–10; *see also* ECF No. 88 at 2, 9 ¶24, & 22.) Ms. True, however, has not submitted any authenticated proof that her account was hacked or that these specific postings were the subject of any such hacking, or that these posts were changed in any manner from what she herself initially posted. (*See* ECF No. 77, Ex. 3 (True Dep.) at 319:20–25 (claiming account was hacked but does not know who did so or when).) On their face each posting was attributed to Ms. True. And Ms. True recognizes that these postings, along with her explanations, are what Delta considered when determining if she had violated its Social Media Policy. (*See* ECF No. 77, Ex. 3 (True Dep.) at 342:1–4.)

On June 18, 2020, Delta suspended Ms. True without pay based upon its conclusion that her postings violated Delta's policies.  (*See* ECF No. 77, Ex. 20; *see also* Ex. 15.)[1]  Following further review, Delta's human resources department and its field operations team internally recommended that Ms. True's employment be terminated.  (*See* ECF No. 77, Ex. 22 at 2–3.)  Delta further noted that after it received complaints that Ms. True's public Facebook page included "insensitive and/or racially charged comments," it conducted a review of those materials and determined that her Facebook posts contained "race-based stereotypes and content that is not aligned with Delta's core values."  (ECF No. 77, Ex. 22 at 2–3.)  While the termination recommendations noted that Ms. True claimed her Facebook account had been hacked, they also noted that Ms. True has not provided "sufficient information to prove" any hacking, and she has not "substantiated that the posts [Delta] reviewed were not authored by her or were altered by someone else."  (*Id.*)

During the period between June 18 and July 9, 2020, Ms. True contacted Delta's general manager for human resources several times to reiterate her claim that her Facebook account had been hacked.  (*See* ECF No, 77, Ex. 21.)  As

---

[1] In its investigation executive summary, prepared the day after Ms. True's interview, Delta noted that:

> Through the investigation, it became clear that Diana posted the articles and although she acknowledged that she had written them, she also stated that someone else had hacked her account and added some information to posts that she had not written. The views she has expressed in the social media posts are inflammatory, divisive, and do not align with our Core Values, nor our mission to be a diverse and inclusive company and workforce.

(*See* ECF No. 77, Ex. 9 (sealed) at 5.)

purported proof of the hacking, on July 19, 2020, Ms. True sent screenshots that appeared to indicate that recently her Facebook account was logged into from locations she claimed she was not present in, such as Big Timber, Montana, Sandy Utah, American Fork, Utah, and Parowan, Utah.  (*See id*.; *see also* ECF No. 88 at 10 ¶27; ECF 88-7.)  Although Ms. True claims that these screenshots show that postings were being made to her account from these locations, the screenshots only indicate that her Facebook account may have been logged into from those location— they do not establish that any postings were made.[2]  Further, the screenshots do not establish that anyone logged into Ms. True's Facebook account or posted anything to her personal Facebook page on any of the dates that align with the postings that were at issue.

Ms. True sought an appeal of Delta's decision to terminate her employment. In her appeal letter, Ms. True acknowledged that at least two of the posts "were actually written by me," and, referencing her screenshots, claimed she "previously provided information to Delta that shows that others have hacked into my Facebook page and made posts from places I have never been and using devices that I have never had."  (See ECF 77, Ex. 18 at 3.)  She submitted no other proof on hacking.[3]

---

[2] (*See* ECF 77, Ex. 3 (True Dep.) at 365:22–25 ("Q. Okay. The screenshots didn't say you were hacked. It just shows where there was a login; is that right? A. Correct.").)

[3] Ms. True has acknowledged that the screenshots are the only evidence she presented to support her hacking theory.  (*See* ECF 77, Ex. 3 (True Dep.) at 367:16–21) ("A.  All I have is the screenshots of where it said I logged in.  Q.  Okay. And did you ever reach out to Facebook?  A. Yes, I did. Numerous times.  And I never heard back from them.").).

On October 15, 2020, Delta's Equal Opportunity and Compliance Office reviewed the circumstances surrounding Ms. True's termination and the information submitted by Ms. True and informed Ms. True that it was denying her appeal and upholding her termination.  (*See* ECF No. 77, Ex. 23 at 2 (confirming that she was terminated for violating Delta's Social Media Policy and that "[a] review of [her Facebook] posts and your page has determined that you wrote several posts which contain race-based stereotypes and other content that is not aligned with Delta's core values which include embracing diverse people, thinking and styles.").)  Delta also informed Ms. True that, "[a]lthough you claim that your Facebook account was hacked and that you did not write some of the insensitive language on your pages, you did not provide sufficient information to support this." (*See id.*)[4]

Delta also rejected as unsupported Ms. True's newly advanced argument that her termination was in retaliation for her complaining about Delta's purple uniform:  "You provided no information to support this allegation, however, and available information establishes that your termination was for the reasons previously stated.  Your allegation that you were terminated for retaliatory reasons is, therefore, unsubstantiated."  (*Id.*)

On May 23, 2020, Ms. True and other Delta employees commenced an action against Delta in this court alleging violations of the Americans with Disability Act

---

[4] (ECF 77, Ex. 23 at 2 ("You stated again that your Facebook account was hacked but provided no new information to support this claim.").)

and asserting claims of retaliation and "discrimination, harassment and failure to accommodate based on a disability." (*See True v. Delta Air Lines, Inc.*, No. 2:20-cv-191 (D. Utah), ECF No. 2.) Her claims were dismissed on May 26, 2023, for failure to prosecute. (*See id.*, ECF Nos. 69, 71.)

On July 16, 2021, Ms. True filed her Complaint to commence this action. (*See* ECF No. 2.)

<u>LEGAL STANDARDS</u>

Summary judgment may be granted when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In resolving a motion for summary judgment, the court views "the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008) (citation omitted). Despite the deference given to a nonmoving party, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir.1999)). The mere existence of a

scintilla of evidence in support of the nonmoving party's case is insufficient.

*Anderson*, 477 U.S. at 252.  And a failure of proof concerning an essential element

renders all other facts immaterial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).

The facts in this action are considered in the light most favorable to Ms.

True, the non-moving party on summary judgment.  *See Hiatt v. Colo. Seminary,*

858 F.3d 1307, 1310 (10th Cir. 2017).  And while the court will liberally construe

Ms. True's filings because she is appearing *pro* se, the court will not act as her

advocate.  *See Muller v. Perdue*, 744 F.App'x 555, 558 (10th Cir. 2018).

<u>ANALYSIS</u>

To establish a prima facie case of race discrimination, Ms. True must

demonstrate that: (1) she is a member of a protected class; (2) she suffered an

adverse employment action; (3) she was qualified for the position; and (4) she was

treated less favorably than others not in the protected class.  *See Sanchez v. Denver*

*Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998).  Because Ms. True alleges that

she is a victim of "reverse" discrimination the first requirement shifts somewhat.

Because she is not in a protected class, she must either establish "background

circumstances that support an inference that the defendant is one of those unusual

employers who discriminates against the majority," or "produce facts sufficient to

support a reasonable inference that but for plaintiff's status the challenged decision

would not have occurred."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d

1193, 1201 (10th Cir. 2006) (cleaned up); *Gerovic v. City & Cnty. of Denver*, No. 22-1148, 2023 WL 2293518, at *7 (10th Cir. Mar. 1, 2023) (unpublished) (citing *Argo*).

Because Ms. True lacks any direct evidence of discrimination, she may use the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under that framework, she must initially establish a prima facie case of discrimination.  *See id.* at 802.  If she does so, the burden shifts to Delta to articulate that it had some "legitimate, nondiscriminatory reason" for terminating her.  *Id.*  An if Delta does so, the burden then shifts back to Ms. True to establish that the proffered legitimate reason was merely a pretext for discrimination.  *See id.* at 804; *Gerovic*, 2023 WL 2293518, at *7; *see also Hiatt*, 858 F.3d at 1316 ("If the employer satisfies this burden, then summary judgment is warranted unless the plaintiff can show there is a genuine issue of material fact as to whether the proffered reason is pretextual.") (cleaned up).  Thus, Ms. True's reverse race discrimination claim cannot survive summary judgment, regardless of whether she has established a prima facie case of discrimination, if she cannot show that Delta's reasons for her termination were pretextual.

Ms. True's path to establishing a retaliation claim follows a similar route. Absent direct proof of retaliation (which is not alleged or present here), she must prove a prima facie case of retaliation by a preponderance of the evidence.  *See Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014).  To do so, Ms. True must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action—i.e., her termination; and (3) that there was a causal

connection between the protected activity and her termination.  *See id.* (citations omitted).  And, if Ms. True does so, her retaliation claim is also subject to the same *McDonnel Douglas* burden-shifting test as her reverse discrimination claim.  *See id.*

### A.  *Plaintiff Fails to Establish a Prima Facie Discrimination Claim*

Although Ms. True alleges that Delta treated her "disparately because of her race" and that "Delta management treated similarly situated African American employees more favorably than it has treated her" (ECF No. 2 (Compl.) at ¶34), she has failed to identify or provide any evidence of any employee who Delta purportedly treated "more favorably" than her.  Aside from her speculative allegations and argument, Ms. True has failed to present any evidence that Delta treats its African American employees more favorably.

The undisputed record before the court shows that Delta established a Social Media Review Committee to review any social media violations and recommend consistent discipline.  (ECF 77, Ex. 1, at ¶ 14.)  Further, Delta has presented evidence that that it has terminated hundreds of employees (of all races) for their violations of Delta's Social Media Policy and cited a pending federal court action in support.  (*Id.* at ¶¶15, 16.)  Delta also submitted proof that that an African American employee, who created social media postings concerning Ms. True that Delta determined violated its Social Media Policy, was put on 18 months' probation, and ultimately resigned.  (*See* ECF 76 at 20 ¶¶69–74; ECF No. 77, Ex. 24 at ¶¶ 15-17.)  Ms. True has not presented evidence to rebut these facts and, without doing, she cannot meet the burden of proving that Delta is the unusual employer who

discriminates against white employees.  *See Swain v. Normac Foods, Inc.*, 106 F.3d 414, 1997 WL 12118 at *1 (10th Cir. Jan. 8, 1997) (unpublished) (affirming summary judgment noting that plaintiff "presented no facts tending to show that any female employee accused of work rule violations received different or more favorable treatment. Consequently, he failed to establish a prima facie case of reverse discrimination.").

In addition, Ms. True has not demonstrated that "but for" the fact that she is white Delta would not have terminated her employment.  *See Gerovic*, 2023 WL 2293518 at *7.  Even read in the light most favorable to Ms. True, the undisputed evidence reveals that Delta terminated her because it reasonably concluded that she posted material on Facebook that violated Delta's Social Media Policy.  (*See* ECF 76 at ¶¶ 15-19, 29; ECF 77, Ex. 1 at ¶ 13; Ex. 3 (True Dep.) at 376:2-9.)  In fact, she has acknowledged that the posts on her Facebook account that Delta reviewed contained "offensive" and "racist or insensitive remarks."  (*See* ECF No. 77, Ex. 3 (True Dep.) at 346:17–20 (conceding that the posting about George Floyd attributed to her was racially inflammatory and was "horrible"); 348:9–12 (acknowledging that the post concerning George Floyd was "[e]xtremely" offensive and racist); ECF No. 2 (Compl.) at ¶21 (alleging that "someone hacked into her Facebook account and made racially inflammatory posts on the George Floyd incident"); *see also* ECF No. 88 at 10 ¶ 25 (acknowledging that the Facebook postings discussed at her interview "contain racist or insensitive remarks"); ECF 77, Ex. 3 (True Dep.) at 378:11-23 (confirming that she told Delta that she regretted

posting insensitive comments and that it was after reviewing the posting and the circumstances that Delta determined that her termination was appropriate).)

Because she has presented no evidence of reverse race discrimination, Ms. True's claim fails as a matter of law.  *See Gerovic*, 2023 WL 2293518 at *7.

### B.  *Plaintiff Has Not Established Pretext*

Even assuming Ms. True did establish her prima facie discrimination claim, her claim would still fail.  As noted above, Ms. True's claim is barred if Delta can articulate a legitimate, non-discriminatory reason for terminating her and she cannot show that the proffered reason was pretextual.  *See Gerovic*, 2023 WL 2293518, at *7; *Hiatt*, 858 F.3d at 1316 (noting "summary judgment is warranted unless the plaintiff can show there is a genuine issue of material fact as to whether the proffered reason is pretextual.") (cleaned up).

Ms. True has not made such a showing.  The undisputed record here is that Delta explained that Ms. True's employment was terminated based on its good faith determination that she violated Delta's Social Media Policy and other related policies through her Facebook postings.  (*See* ECF 77, Exs. 22, 23.)  More specifically, Delta concluded that Ms. True violated Delta's Social Media Policy by making posts on Facebook that were racist and offensive. (*See id.*; *see also* ECF No. 77, Ex. 9 (sealed) at 5 (noting in its "Investigation Summary" that "it became clear that [Ms. True] posted the articles and although she acknowledged that she had written them, she also stated that someone else had hacked her account and added some information to posts she had not written.  The views she has expressed in the

social media posts are inflammatory, divisive, and do not align with our Core Values").)  Ms. True has not presented any evidence to rebut that explanation.  To the contrary, she has acknowledged that relevant Facebook postings at issue violated that policy.  (*See., e.g.,* ECF No. 77, Ex. 3 (True Dep.) at 346:17–20, 348:9–12 & 378:11-23; ECF No. 2 (Compl.) at ¶21; ECF No. 88 at 10 ¶25.)

And while Ms. True asserts that she did not write all the language in the offensive posts, and that the racist and offensive portions must have been added by a hacker, she has not presented any information to support these assertions.  At most she submitted screenshots purportedly showing her Facebook account was logged into from locations where she was never present.  But that information, even assuming it is true, does not establish that her account was hacked and that language to the postings was added when the account was accessed.  Further, none of the dates linked to that access align with the posts at issue; rather, all but one post-date the Facebook posts that Delta reviewed and considered in reaching its termination decision.  (*See* ECF 88-7.)

And in any event, Ms. True's unsubstantiated arguments do not refute Delta's showing that it engaged in an adequate investigation when it terminated her.  The record establishes that Delta reviewed her Facebook postings.  It interviewed Ms. True and in her interview, she acknowledged that the relevant Facebook posts were on her Facebook page.  Indeed, she admitted to writing at least part of all of them.  It solicited further submissions from Ms. True following that interview.  It reviewed those submissions, including her assertion that her account

was hacked and the screenshots she submitted.  It permitted Ms. True to file an appeal of its termination decision.  Delta reviewed her appeal and affirmed its termination decision.  Under these circumstances Delta's conclusion that Ms. True was responsible for these posts was reasonable.  Thus, there is no foundation for a finding of pretext.  *See, e.g., McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (affirming summary judgment finding there was no dispute or genuine issue concerning defendant's proffered reason for termination noting that "[t]he test is good faith belief … if [defendant] believed [the allegations against plaintiff] and terminated [plaintiff] for that reason, such belief would not be pretextual even if the belief was later found to be erroneous") (cleaned up); *Jacobs v. Delta Air Lines, Inc.*, 156 F.3d 1243, 1998 WL 514620, at *3 (10th Cir. 1998) (unpublished) (affirming summary judgment against Delta employee observing that "challenging the veracity of the allegations avoids the relevant inquiry—i.e., whether Delta believed them, and acted in good faith upon that belief in terminating him" and noting that the employee "presents no evidence indicating that Delta did not believe the allegations and our review of the record reveals no evidence that Delta did not act in good faith.  Given that he admits to the core of the allegations, we discern no showing of pretext.") (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir.1993), *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991); *see also Swain*, 1997 WL 12118, at *2 (affirming summary judgment and agreeing with employer's argument that the relevant inquiry is not

whether the alleged misconduct actually took place but whether the employer believed at the time of discharge that the conduct had occurred).

### C. Plaintiff's Retaliation Claim Also Fails

In its summary judgment motion, Delta argues that Ms. True's retaliation claim should fail because she cannot establish any causal connection between her protected activity and her termination.  (*See* ECF No. 76 at 29–32.)  Delta asserts in its motion that there is a lack of temporal proximately between Ms. True's late 2018 complaints that Delta's purple uniforms were making her sick, her related request for an accommodation, and her eventually termination.  Delta also claims that Ms. True's complaints, raised in June 2020, about unfair treatment by her co-workers, even if considered protected activity, "cannot be considered causally connected to her termination as a matter of law" because Delta's investigation of Ms. True "began prior to" these complaints.  (*See* ECF 76 at 31.)  And in its reply brief, Delta identifies Ms. True's creation of her purple uniform Facebook page in December 2018 and her alleged complaints to the National Institute of Occupational Safety and Health ("NIOSH") as her protected activities and argues that because she was not terminated from her position until more than one year after these events no inference of a causal connection can be drawn.  (*See* ECF 91 at 11–12.)

Delta's motion, however, ignores that Ms. True had alleged in her complaint that she "composed a letter and emailed the same to Ed Bastian, CEO of Delta," in approximately May 2020, in which she claims see "complained about how some Delta employees who were African American were bullying and harassing her and

other Delta Employees who were Caucasian." (*See* ECF No. 2 (Compl.) at ¶17.).

Delta's motion also ignores Ms. True's allegation that she sued Delta in this very

court on March 23, 2020, for failure to accommodate and for retaliation under the

Americans with Disability Act—an action that is a "protected activity" (*See* ECF

No. 2 (Compl.) at ¶11 (referring to *True v. Delta Air Lines, Inc.*, No. 2:20-cv-191 (D.

Utah), ECF No. 2).); *see, e.g.*, *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015

(10th Cir. 2004) (recognizing that "[p]rotected opposition can range from filing

formal charges to voicing informal complaints to superiors") (citation omitted);

*Robbins v. Jefferson Cnty. Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999)

(noting that "Title VII extends protection to those ... who informally voice

complaints to their superiors or who use their employers' internal grievance

procedures") (cleaned up).  Ms. True's federal lawsuit against Delta was very much

pending less than three months later when in June 2020 Delta made an adverse

employment decision as to Ms. True.

        As noted above, Delta does not expressly address these activities,[5] both of

which took place within a month or two of Delta's initial suspension of Ms. True.

---

[5] Delta's reply memorandum includes an argument in a footnote that Ms. True had waived certain challenges to Delta's summary judgment arguments because she did not oppose them. (*See* ECF No. 91 at 12 n.4.)  These arguments include that: (1) there is no causal connection between Ms. True's request for accommodation not to wear the purple uniform and her termination; (2) that Ms. True did not engage in protected activity by reporting to Delta that other flight attendants "targeted" her by complaining about her offensive social media posts.  Because Delta's motion does not expressly address Ms. True's prior lawsuit or her complaint to Delta's CEO, this waiver argument is not applicable to them.

The temporal proximity of these two activities—one of which occurred within one month of Ms. True's suspension—may justify a causal connection inference. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (observing that courts have determined that that a one and one-half month period between protected activity and adverse action may establish causation but that a three-month period is insufficient and deferring on whether a two month and one week period between protected activity and adverse action may be as too long to infer causation).[6]

It is not clear why Delta did not address these events, particularly Ms. True's prior federal court action given that Delta appeared in that action.  Instead, as noted above, Delta only refers to Ms. True complaints about uniforms and her post-suspension complaints about her co-workers.  (*See* ECF No. 76 at 13 ¶34, at 29–32; ECF 91 at 11–12.)  Equally troubling is Delta's argument that Ms. True's complaints about her co-workers' conduct toward her "cannot be causally connected to her termination as a matter of law."  (*See* ECF 76 at 31.)  Delta argues that its

---

[6] This remains a close question as courts have concluded that nearly the same amount of time does not support such an inference. *See, e.g., Painter v. Midwest Health, Inc.*, No. 21-3195, 2022 WL 17332734, at *6 (10th Cir Nov. 30, 2022) (unpublished) (concluding that a three-month gap between complaint and termination was "too long to establish a causal connection by itself").  Assuming there was no temporal proximity between her activities and her termination, Ms. True was required to present some "additional evidence" tying her termination to the protected activity to forestall summary judgment. *See Ward*, 772 F.3d at 1203. In other words, she had to present evidence that her firing would not have occurred but for the protected activity, and that such evidence "must be based on more than mere speculation, conjecture, or surmise." *Id*. (quotations and citation omitted).  On this record, Ms. True has not done so.

investigation of Ms. True, which apparently began no earlier early June 11, 2020
(see ECF No. 77, Ex. 10), was "prior" to her making any complaints about her co-
workers.  (*See* ECF No. 76 at 31.)  But according to her Complaint, Ms. True sent a
written complaint to Delta's CEO around May 2020 to complain that she was being
bullied and harassed because of her race.  (*See* ECF No. 2 (Compl.) at ¶ 17.)  That
activity—if it occurred—predates Delta's investigation of Ms. True.  And that
activity is colorably a protected activity as it concerns a complaint of racial
discrimination.  *See, e.g., Hertz*, 370 F.3d at 1015 (noting that "voicing informal
complaints to superiors" can count as protected activity).  Here Delta has not
addressed these allegations and drawing all inferences in Ms. True's favor, and
construing her pleadings and filings liberally, the court cannot conclude that Delta
has established, as a matter of law, that Ms. True is unable to establish a prima
facie case for retaliation.

Nevertheless, summary judgment for Delta on Ms. True's retaliation claim is
warranted.  As the *Anderson* court concluded, even assuming these allegations
support a causal connection and are otherwise sufficient to support a prima facie
case of retaliation, because (as discussed above) Ms. True is unable to establish that
Delta's proffered reason for terminating her employment was pretextual, summary
judgment against her on her retaliation claim remains the appropriate disposition.
*See Anderson*, 181 F.3d at 1179; *see also Argo v. Blue Cross & Blue Shield of
Kansas, Inc.*, 452 F.3d 1193, 1203–04 (10th Cir. 2006) (affirming summary
judgment for employer recognizing that temporal proximity between protected act

and employee's termination alone does not establish pretext and support a conclusion that termination was retaliatory where employer proffered legitimate reasons for termination).

<u>CONCLUSION</u>

For the reasons explained above, this court recommends that the District Court GRANT Delta's motion for summary judgment.

Copies of the foregoing Report and Recommendation are being sent to all parties who are hereby notified of their right to object.  Within fourteen (14) days of being served with a copy, any party may serve and file written objections.  A party may respond to another party's objections within 14 days after being served with a copy.  Failure to object may constitute a waiver of objections upon subsequent review.

DATED this 4th day of April 2024.

BY THE COURT:

_____
Hon. Dustin B. Pead
United States Chief Magistrate Judge

- 21 -